J-A04034-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| GRAHAM B. SPANIER | |
| Appellant | No. 1093 MDA 2017 |

Appeal from the Judgment of Sentence Entered June 2, 2017
In the Court of Common Pleas of Dauphin County
Criminal Division at No.: CP-22-CR-0003615-2013

MEMORANDUM

Stabile, J.                                                          Filed:  August 10, 2018

Pending before this Court is the July 10, 2018 application of Appellant Graham B. Spanier ("Appellant"), requesting my recusal in this appeal and a vacatur of our panel decision issued June, 26, 2018 ("application"), affirming Appellant's misdemeanor conviction for endangering the welfare of children ("EWOC").  The basis for this request lies in Appellant's assertion that I, no later than a dozen years ago, in a completely unrelated matter to Appellant's current criminal appeal, was part of an alumni association that opposed a proposal by the Pennsylvania State University ("PSU") to relocate the then Dickinson School of Law ("DSL") from Carlisle, Pennsylvania, to PSU's main campus in State College.  Appellant asserts that my conduct constitutes prior, personal involvement with Appellant that establishes bias or lack of impartiality on my part requiring that I recuse myself from this appeal.  I write

1

both to address the application and to provide the transparency to which the citizens of this Commonwealth are entitled.

By way of background, more than 20 years ago in 1997, PSU announced that it would affiliate and then merge with DSL located in Carlisle. I recall attending a celebratory reception at DSL around that time attended by several hundred people. I briefly met Appellant, then the PSU President, simply to introduce myself as a member of the DSL community. To my knowledge, that brief introduction over 20 years ago and to the present, was the first, only, and last time I had any interaction, conversation, or communication whatsoever with Appellant.

In late 2003, despite earlier assurances to the contrary, PSU announced a proposal to close the DSL Carlisle campus and relocate the law school to PSU's main campus in State College. Carlisle, as of 2003, had been the home of DSL for more than 170 years. This announcement surprised many and set off a course of events wherein people for and against the proposal sought to voice their concerns to the governing bodies that would be voting on the proposal including, on behalf of DSL, its then Board of Governors ("Board of Governors"). Almost immediate opposition to the announced plan was heard from, inter alia, numerous state house representatives, senators, regional chambers of commerce, economic development councils, newspapers, a large cross-section of the Central Pennsylvania community, numerous members of the Board of Governors, and the DSL General Alumni Association ("GAA") of

which I was a member, but never an officer. I held membership on the GAA board due to my position as the president of the Capital Area alumni chapter of DSL.

After the DSL Board of Governors rejected PSU's relocation proposal, PSU submitted a second proposal to establish two law schools under a single accreditation. PSU, inter alia, would build a new law school on its State College campus and appropriate monies to upgrade and maintain the DSL Carlisle campus. In early 2005, the DSL Board of Governors accepted this proposal. During the years 2003-2005, when these proposals were considered, I made my views known to the DSL community through the GAA and within the Carlisle community. At no time did I attempt to communicate my views to Appellant, or to the Penn State Board of Trustees. Moreover, I did not hold a position individually, or within an organization entitled to vote on any proposal. In summary, I was one person within the GAA who joined a cacophony of people, representatives, and organizations that expressed an interest in the future of DSL and opposition to its closure and relocation to State College. The central purpose of an alumni association is to promote the general welfare of its alma mater, which in this case was DSL. In brief, my participation through the GAA was precisely to foster that objective.

After receipt of this Court's panel decision (which I authored) upholding Appellant's conviction for misdemeanor EWOP, Appellant filed his application seeking my retroactive recusal from his appeal based upon his claim that I

harbored a personal bias against him, or that there was an appearance of bias suggesting impropriety by my participation in his appeal. The fundamental flaw in Appellant's application is that it conflates opposition to PSU's relocation plan and two-campus proposal as one directed at him personally. In effect, Appellant attempts to supplant himself as the alter ego for PSU as the party to the DSL dispute to argue bias as a basis for my recusal. The matter, and my participation as a member of the GAA did not involve Appellant personally.

While an appearance of impropriety may itself be enough to warrant judicial recusal, In re McFall, 617 A.2d 707 (Pa. 1992), "[a] party seeking recusal bears the burden of producing evidence to establish bias, prejudice, or unfairness which raises a substantial doubt as to [a] . . . jurist's ability to preside impartially." Commonwealth v. Watkins, 108 A.3d 692, 734 (Pa. 2014) (citation omitted). In addition, when a motion for recusal is filed after a decision has been rendered, the burden of proof is more exacting. In Reilly by Reilly v. SEPTA, 489 A2d. 1291 (Pa. 1985), our Supreme Court explained the rationale for this more exacting standard. While stated in the context of addressing a post-verdict claim for recusal of a trial judge, the logic and rationale apply equally here.

> Charges of prejudice or unfairness made after trial expose the trial bench to ridicule and litigants to the uncertain collateral attack of adjudications upon which they have placed their reliance. One of the strengths of our system of justice is that once decisions are made by our tribunals, they are left undisturbed. Litigants are given their opportunity to present their cause and once that opportunity has passed, we are loathe to reopen the controversy

- 4 -

> for another airing, save for the greatest of need. This must be so for the security of the bench and the successful administration of justice. Accordingly, rules have developed for the overturning of verdicts and judgments for after-acquired evidence. In our view, recusal motions raised after verdict should be treated no differently than other after-acquired evidence situations which compel the proponent to show that: 1) the evidence could not have been brought to the attention of the trial court in the exercise of due diligence, and 2) the existence of the evidence would have compelled a different result in the case.

Id. at 1301.

Litigants also are counseled that a request for disqualification of a judge should not be made lightly. See Lomas v. Kravitz, 170 A.3d 380, 390 (Pa. 2017) (Chief Justice Saylor, dissenting, citing cases). A request for disqualification is a most serious undertaking not to be pursued absent thorough factual investigation and legal research. Id. Here, inexplicably, despite having the burden of proof in this matter, Appellant chose not to provide this Court with the documentary evidence relied upon in his application. Instead, Appellant principally relies upon his selection of passages from documents apparently sent to him by DSL former Dean Philip McConnaughay (2002-2013).[1] Application at 9. Nevertheless, for purposes of deciding Appellant's application, I will assume Appellant's document

---

[1] Appellant and former Dean Philip McConnaughay, resident at DSL during 2003-2005, now residing in Beijing, China, verified the application to the extent the facts were within their respective personal knowledge. It is unclear what alleged facts remain unverified.

selections represent his best attempt at demonstrating the necessary bias to justify my recusal.

The standard under which a judge presented with a recusal motion must conduct his or her inquiry is as follows.

> A motion for disqualification or recusal is properly directed to and decided by the jurist whose participation is challenged. Goodheart v. Casey, 523 Pa. 188, 565 A.2d 757 (1989). In disposing of a recusal request, a jurist must first make a conscientious determination of his or her ability to assess the case before the court in an impartial manner, free of personal bias or interest in the outcome. "This is a personal and unreviewable decision that only the jurist can make." Id. at 201, 565 A.2d at 764. Once satisfied with that self-examination, the jurist must then consider whether or not continued involvement in the case would tend to undermine public confidence in the judiciary. Id. at 201-202, 565 A.2d at 764.

Commonwealth v. Travaglia, 661 A.2d 352, 370 (Pa. 1995). Consideration of a recusal motion also must be tempered by a jurist's obligation to hear and decide cases assigned to the judge. See Pa. Code of Judicial Conduct Rule 2.7. Although there are times when disqualification or recusal is necessary to protect the rights of litigants and to preserve the public's confidence in the judiciary, unwarranted recusal or disqualification may bring public disfavor upon the court and judge. Id. cmt. Judges may not use recusal or disqualification to avoid cases that are difficult, controversial, or present unpopular issues. Id. Against the above background and standards, I now address, seriatim, the bases upon which Appellant claims my recusal is required in this matter.

Based upon emails and documents provided Appellant by former Dean McConnaughay (application at 9), Appellant first generally identifies a writing from November 2003 that he avers I wrote to a "DSL administrator" expressing concern about exclusion of the GAA from discussions about the move to State College. Appellant does not identify the "DSL administrator." Nonetheless, Appellant is not the subject of the communication and the communication is not represented as containing any disparaging comments about the Appellant.

Appellant next generally identifies a second writing from me the following day (date unspecified) to GAA board members (again unspecified) complaining about the response received from the "administrator" (again unidentified) informing him that DSL alumni were adequately represented on the Penn State Board of Trustees and, therefore, the GAA's input was not necessary. Appellant opines that I directed ire at "Penn State administrators (which included Dr. Spanier)," complaining, "I still do not understand why Penn State bothered to merge Dickinson if it seems intent on changing everything about the school. They could've built their own damn school in State College and accomplished the same thing without eradicating an institution." Application at 4. Once again, Appellant is not the subject of the communication, nor is it personally critical of him. In a somewhat disingenuous manner, Appellant attempts to paint broadly by recasting my generic reference to "Penn State" as a reference to "Penn State

administrators," which in turn must include—and therefore be personally critical of—Appellant, "Dr. Spanier." Id. Appellant repeats this unwarranted overreaching several times in his application to give the false impression that I made derogatory comments about him. This is an impermissible attempt to bolster a claim of personal bias where none exists.

Continuing, Appellant again generally references another email (undated) by me to GAA board members claiming that with regard to Penn State's proposal to relocate DSL "there is a certain arrogance here that is unacceptable." Id. Again, the statement is not directed toward any particular person, and in particular Appellant, but once again only generically references "Penn State." I had no reason to reference Appellant, as I never interacted with him in regard to any law school proposal. Appellant admits as much when he states in his application, "[He did not deal directly with the GAA board or regularly interact with opponents of the proposals." Id. at 8.

Appellant next references a five-member ad-hoc committee of the GAA on which I served. That committee issued a report urging the GAA board to recommend that the Board of Governors not approve the two-campus proposal. Id. at 5. Although I was a member of an ad-hoc committee that produced a report, my recollection is that the GAA formed somewhere between four to six different ad-hoc committees that produced reports. The GAA decided it would form committees to research and report on each of the rationales advanced in support of PSU's proposals. I was assigned to one of

those committees chaired by another former Dean and professor of DSL, John A. Maher (now deceased), whose knowledge of the proposals and of the inside relationships between DSL and PSU and any administrators far surpassed that of any other committee member. In point of fact, I possessed no personal knowledge of any facts or comments referenced in the report authored by Dean Maher regarding any PSU administrator.

Without producing the report, Appellant relates that the committee, of which I was a member, issued a report extremely critical of Penn State and describing its administration as "incompetent," and states that the report specifically mentioned and criticized Dr. Spanier several times. Appellant however, accurately states that when I later testified in a lawsuit filed by members of the DSL Board of Governors against PSU, I disassociated myself from the language of the report, explaining that my endorsement was only as to its "conclusions" and "substantive comments." Any knowledge of inside facts about Appellant contained within the report, and in particular those critical of him, were exclusively within the personal knowledge of Dean Maher, who authored the report. My testimony demonstrated that I was concerned with substance as opposed to launching any personal attacks against persons whose views on the topic differed from my own.

In an attempt to impute bias on my part toward Appellant through guilt by association, Appellant highlights portions of another email, sent in June 2004 by an unidentified member of the GAA, commenting that Appellant was

a "chief hustler" pushing for approval of the PSU proposal. Id. at 4-5. Notably, Appellant does not even feign to attribute this statement to me. Plain and simple, this statement reflects the views of a third party entirely irrelevant to Appellant's burden to produce proof of bias against him by me. Appellant's attempt to attribute this statement by a third party to me is simply unfair and does not do justice to fair advocacy. See Commonwealth v. Shannon, 184 A.3d 1010 (Pa. Super. 2018) (mere receipt of offensive emails does not establish bias on the part of the person receiving the emails).

In early 2005, the DSL Board of Governors met to vote on the two-campus proposal. Appellant points to an email I wrote to the GAA board the day before the vote commenting, "I can't imagine why many think this is a great proposal. The emperor certainly has new clothes." Application at p. 6. Appellant further quotes my statement, "We should tell PSU 'NO' and insist they honor their commitment; that is what honorable people do. The crisis here has been wholly fabricated by PSU." Appellant characterizes this writing as accusing "Penn State administrators (which included Dr. Spanier) of dishonorably breaching their commitments to DSL, fabricating a crisis, and acting unjustly." Id.

The reference to the "emperor certainly has new clothes" harkens back to a children's fable written by Hans Christian Anderson meant to describe situations where people willfully disbelieve something they know to be true. The subject of the email is the "proposal" to create two law school campuses,

not an individual. The point was that PSU was trying to convince people that State College presented better professional opportunities for law students than Carlisle, whose location, inter alia, is in close proximity to all three branches of state government and a multitude of law firms. As for my statement regarding PSU honoring its commitment, to be clear once again, my email nowhere refers to "Penn State administrators" or to "Dr. Spanier." As before, I generically referenced "PSU" and nowhere criticized any individual by name.

The DSL Board of Governors, by a split vote, accepted PSU's two-campus proposal. Appellant relates that on February 3, 2005, three members of the DSL Board of Governors filed suit against PSU, Appellant, and the DSL Board of Governors to enjoin implementation of the plan. Appellant further avers that the plaintiffs asked the GAA board to consider intervening in the suit on behalf of the plaintiffs. As a member of the GAA board at that time, I recall participating in discussions both for and against the request. The GAA board declined the invitation to intervene. I respected that decision. At no time did I become a party to the plaintiffs' suit. I therefore fail to see how Appellant claims bias by me based upon a lawsuit filed by third parties. See Shannon, supra.

It is true that I testified during the course of the plaintiffs' prosecution of their suit. I did so under compulsion of subpoena that obligated me to appear and be subject to questioning. Appellant avers that during the course

of my testimony, I stated that "emotions were running high on both sides" and that the GAA viewed the "proposal's supporters" as personally attacking the GAA members, by casting them as being angry or malcontents, and that we were further disappointed our research on substantive issues was not addressed. Without doubt, the threatened closing or relocation of DSL was an issue that riveted many different interests. People who considered themselves stakeholders in the continued preservation of DSL felt anxiety. More to the point, Appellant does not identify the "proposal's supporters" that engaged in personal attacks. Appellant certainly has not included himself in this category and nowhere does Appellant indicate that I charged him with hurling personal attacks against any member of the GAA, including me.

Appellant has the burden of producing evidence establishing bias, prejudice, or unfairness that raises a substantial doubt as to my ability as a judge to participate in his criminal appeal. Watkins, supra. He has failed to do so. All Appellant has established is that I, as a member of the GAA, in an unrelated matter concluded more than a dozen years ago, expressed opposition to proposals by PSU to fundamentally change DSL. Appellant has produced no proof that I was personally critical of him in that matter, or that I ever viewed the PSU/DSL dispute as anything other than a matter that had to be decided between the governing bodies of those institutions. Recusal is not warranted under these circumstances.

In Commonwealth v. Whitmore, 860 A.2d 1032 (Pa. Super. 2004), this Court, sua sponte, directed that a new trial judge be assigned to preside over resentencing to ensure that any appearance of bias was dispelled, since, inter alia, the trial court during sentencing commented that the defendant "should go to jail for about 50 years." The trial court was entitled to sentence the defendant to a maximum of 20 years, which it did. Our Supreme Court granted allowance of appeal to decide whether this Court exceeded its authority by sua sponte removing the sentencing judge. It concluded that error was committed. Commonwealth v. Whitmore, 912 A.2d 827 (Pa. 2006). The Court acknowledged that comments made by the trial judge considered factors beyond the defendant's prior conviction. However, during sentencing, the trial court also referenced the defendant's neighborhood, inability of inhabitants to leave, other charges pending against defendant, his history of trouble with the legal system, the nature of the area, and the like. It concluded that the single comment made by the trial court that the defendant should go to jail for 50 years was taken out of context and did not warrant a per se recusal. A trial judge who has made some ill-advised comments does not necessarily abuse discretion in denying a motion for disqualification. Id.

In Travaglia, supra, a jury convicted co-defendants of first-degree murder of a police officer. Both received death sentences. After the first post-

conviction[2] review proceedings for one of the defendants, the trial judge was quoted in newspapers commenting about the case. The trial judge commented that the defendant's case was an example of how cumbersome and protracted the appeals process can be when there has been a sentence of death. He further stated that something is drastically wrong with our system. In another press interview, he was quoted as saying, "If it takes 10 years to determine if I gave them a fair trial, there's something wrong with the judicial system. . . ." He later was quoted as saying he was "shocked that it takes 11 years in our judicial system to find an excuse to avoid the death penalty. If anyone deserves to die, these two individuals . . . do for killing four people for fun." After one defendant filed his second PCRA petition, the trial judge was quoted as saying he was not biased, he gave defendant a fair trial, and he could give him a fair hearing on the present petition. In his second PCRA petition, the defendant asserted that the trial judge should have recused himself. In response, the trial judge detailed the examination of his conscience and admitted that while he was highly dissatisfied with the present system of perpetual appellant activity, that was not to say the court would vent its frustration by arbitrarily giving the defendant less than full and complete attention required by law. He candidly admitted that the crime that defendant committed was heinous, but observed courts are often required to

_____

[2] Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546.

- 14 -

preside over cases where the subject matter is disturbing. However, due process required he be unaffected by such circumstances. Our Supreme Court found no abuse of discretion in the trial court's denial of the recusal request.

In Commonwealth v. Druce, 848 A.2d 104 (Pa. 2004), our Supreme Court affirmed a trial court's denial of a recusal motion when the trial judge gave a press interview prior to imposing sentence and called some of the defendant's claims "strange," but then also indicated that public sentiment would not sway his handling of the case. Immediately before sentencing, the trial judge told the defendant he held no bias, prejudice or ill will against him. Our Supreme Court held that the trial court did not abuse its discretion in denying recusal where the trial judge asserted his impartiality, both in the public interview and from the bench, in response to the petition to recuse.

In contrast, in McFall, supra, the trial judge had been working for several months as an undercover FBI agent regarding illegal payments by union officials to common pleas court judges in Philadelphia. The trial judge wore a recording device and recorded conversations with other judges. This continued during the period the trial judge continued to preside over criminal matters. While the trial judge's agreement with federal authorities did not provide for immunity from prosecution, it did promise that the federal authorities would make known to any other court or investigating or prosecuting body the extent of the judge's cooperation. On these facts, this Court held that the trial judge had a real and tangible bias in the criminal

cases heard by her, since she was subject to prosecution for her actions by the District Attorney of Philadelphia, the prosecuting authority in each of the cases before her. See also cases cited in McFall; Commonwealth v. Bryant, 476 A.2d 422 (Pa. Super. 1984) (recusal necessary where the trial judge had commented that, in order to generate pre-election publicity for himself, the date for a defendant's sentencing would be moved up to the day proceeding an election in which the judge was a candidate and he would impose the maximum possible sentence); Armor v. Armor, 398 A.2d 173 (Pa. Super. 1978) (full bench recusal required where woman remarried to a common pleas judge of that county's bench would have to appear before one of her husband's judicial colleagues on support matters).

Where the appearance of bias is less attenuated, but arises in an instance where great deference is given to a trial judge's discretion, recusal may be required. In Commonwealth v. Darush, 459 A.2d 727 (Pa. 1983), the trial judge made derogatory comments about a defendant while the judge was a district attorney. The judge could not admit or deny that he had made the statements, claiming he had no recollection. He nonetheless indicated that the defendant would receive a fair trial. In concluding that recusal was required, our Supreme Court held that while it could discern no evidence of bias and was convinced the judge acted with complete integrity, the largely

unfettered sentencing discretion afforded a judge required that sentencing be exercised by a judge without a hint of animosity towards the defendant.[3]

In Commonwealth v. Berrigan, 535 A.2d 91 (Pa. Super. 1987), this Court, following our Supreme Court's lead in Darush, held that while a judge's denial of a request that he recuse at trial was not reversible error, the judge's refusal to recuse at sentencing was improper. The trial judge made comments both during and after trial indicating that he became emotionally involved in an acrimonious series of confrontations with the defendants. Although the defendants claimed on appeal that the judge's rulings during trial were motivated by bias, we did not find that to be prejudicial error, as we found the allegations of error to be without merit. Nonetheless, that did not settle the question of whether it was proper for the trial judge to preside at sentencing. We held that "[s]ince the judge is the sole finder of fact at that sentencing proceeding, any possible indication of judicial bias-even bias of which the jury was wholly unaware--must be carefully considered when a motion to recuse at sentencing is denied." Berrigan, 535 A.2d at 104.

_____

[3] When Darush was decided, an appearance of impropriety was to be measured against what a significant minority of the lay community could reasonably question regarding a court's impartiality. The test for appearance of impropriety now is whether conduct would create in reasonable minds a perception a judge violated the Code of Judicial Conduct or engaged in other conduct that reflects adversely on the judge's honesty, impartiality, temperament, or fitness to serve. Pa. Code Jud. Conduct, Canon 1, Rule 1.2, cmt 5. For purposes of deciding the present application, I find no need to discern whether this difference in standard would affect my decision on this application.

In Commonwealth v. Dougherty, 18 A.3d 1095 (Pa. 2011), in a concurring statement joined by a majority of the Justices of our Supreme Court, Justice Baer felt compelled to comment on why he believed recusal of the trial judge was necessary. During the defendant's PCRA hearing, the trial judge called the defendant "vile." The hearing transcript, however, did not reflect this comment. At a hearing, the PCRA judge acknowledged that she privately directed the court reporter to remove that comment, which she deemed "non-judicial," from the record. Of interest, while the Court held that the trial judge calling the defendant "vile" would not require recusal, recognizing that an utterance can be understood as an emotional outburst during a difficult proceeding, the trial judge's alteration of the transcript was another matter. In the Court's view, the alteration struck at the very pillars of meaningful appellate review and concomitantly therewith, the basic tenets of due process, which should precipitate serious repercussions. Consequently, the utterance, together with the transcript alteration, was deemed sufficient to create an appearance of impropriety requiring the judge's disqualification.

Upon review, I find that Shannon, Whitmore, Travaglia, Druce, and Dougherty counsel that Appellant's application asking for my recusal be denied. The comments of third parties may not be used to attribute bias to me. Shannon. Comments by a judge that are generally critical of proceedings, without more, do not suffice to establish bias creating an appearance of impropriety. Whitmore, Travaglia and Druce. Statements

that do evidence actual bias create an appearance of impropriety, McFall, Bryant, although an inappropriate utterance when taken in context may not suffice to establish bias warranting recusal. Druce, Whitmore, and Dougherty. I also add that while an appearance of impropriety may be found more easily in instances where a trial judge is entitled to great deference on the exercise of discretion, such as in sentencing where the court must make findings of fact, Darush, Berrigan, and Dougherty, such is not the case with the Superior Court of Pennsylvania. This Court is an error-correcting court whose review of decisions from our trial courts is circumscribed by well-defined scopes and standards of review. This Court does not sit as a factfinder, does not make findings of fact, and does not pass upon the demeanor or credibility of witnesses. In this sense, heightened concerns, such as those reflected in sentencing cases, are not applicable here. The issues in Appellant's appeal concerned whether his conviction for EWOC was barred by the applicable statute of limitations, whether he violated a legal duty, and whether jury instructions on the statute of limitations were sufficient. These were questions of law.

Finally, I address the aspect of Appellant's additional burden of proof as to whether his application could have been brought to the attention of this Court in the exercise of due diligence before the issuance of our panel decision. Reilly, supra.

The Superior Court docket in this case reveals that by letter dated December 21, 2017, Appellant's counsel was advised by this Court that the appeal in his case was scheduled for argument on February 7, 2018, before the A4-2018 argument panel of this Court. The notice further cautioned that any application for continuance must be filed within two weeks of the notice date and, thereafter, only in cases of emergency. This Court also identifies on its website the cases to be heard during an argument session and the names of the judges who will hear the panel cases. In this particular appeal, that information indicated that Appellant's case would be heard on the second day of argument, February 7, 2018, before a panel consisting of Judge Nichols, Judge Ransom, and me.[4] This Court's website also provides biographical information for all judges on the Superior Court. My profile on this Court's website clearly identifies me as a 1982 graduate of DSL, and further, as the President, General Alumni Association, Dickinson School of Law, Capital Area Chapter 2000-2013.[5] To prevent litigants from filing motions to obtain tactical advantages in proceedings before a Court, a party seeking recusal of a judge must do so at the earliest possible moment. Lomas, 170 A.3d at 390 (Pa. 2017); Pa. Code of Judicial Conduct Rule Preamble ¶ 7. Simply because a

---

[4] http://www.pacourts.us/courts/superior-court/calendar

[5] http://www.pacourts.us/courts/superior-court/superior-court-judges/judge-victor-p-stabile

judge does not raise sua sponte the issue of his impartiality, a party is not entitled to question a judge's partiality after the case has ended without substantiation in the record that the complaining party did not receive a full, fair, and impartial trial. Reilly, 489 A.2d at 1301. Further, our Supreme Court has held that, in determining whether due diligence has been satisfied, in addition to actual knowledge of facts underlying an application, facts that "should have been known" also are to be considered in determining timeliness. See Goodheart v. Casey, 565 A.2d 757, 764 (Pa. 1989); Reilly, supra. The fact of my association with DSL and the GAA was easily ascertainable and for the relevant time discussed in Appellant's application, i.e., 2003-2005. This publicly available information would have, at a minimum, provided more than sufficient information for Appellant to conduct due diligence on my background and, in particular, to inquire with his former colleague Dean McConnaughay. Under the circumstances, I do not find Appellant's application timely given its filing after the rendering of our decision in this case. See Lomas, supra (untimeliness of a recusal petition will result in waiver even when there may be an appearance of impropriety).

I also note a Google search of my association with DSL and in particular, with respect to the two-campus proposal, affirms my contention that my participation in the DSL matter was not personal to Appellant. After the two-campus proposal was made final in 2005, when asked, I publicly expressed my support for the success of the proposal and my hope that ranks would

close to support the decision made.[6]  There is a time to be heard and a time to move on.  Coincidentally, I also helped to facilitate the two-campus proposal by voting to accept a much-needed zoning text amendment to the Middlesex Township, Cumberland County, zoning ordinance to permit the temporary use of a township building by DSL during reconstruction of the Carlisle campus.[7] At the time, I was an elected member of the Middlesex Township Board of Supervisors and recall declaring the amendment was a "win-win" for all parties.  This publicly available information should have been considered in Appellant's formulation of his opinion as to whether I harbored any personal bias to support a recusal application.

Upon receipt of Appellant's recusal application, I engaged in a conscientious determination of my ability to assess this appeal in an impartial manner, free of personal bias or interest in its outcome.  I can state with clear conscience that I felt no compulsion of bias, partiality, or interest in the outcome of this case to prevent me from deciding this matter solely on its merits, regardless of the fact Appellant was the party to this appeal.  As to whether Appellant proved bias sufficient to establish an appearance of impropriety, he has not.  As already stated, I do not personally know Appellant

_____

[6]    http://cumberlink.com/news/local/can-carlisle-compete/article_fcfa0dad-5ea8-5a17-a527-a13a8ff3beac.html

[7]https://cumberlink.com/news/trickett-hall-use-to-end-by-this-fall/article_4dce8ec4-28cf-5aaa-8f60-9b0d59c40eae.html

and only once met him more than 20 years ago to exchange a cordial greeting. My participation in the events surrounding PSU's plans to either relocate DSL or create a law school comprised of two campuses was as a member of the GAA. Portions of statements by me produced by Appellant are more than a dozen years old, have no relation to this criminal appeal, and are not personally directed at Appellant. Moreover, after resolution of the DSL campus dispute, I publicly made statements and took action supportive of PSU's two-campus plan, well before the advent of this appeal or before anyone could claim it was in my interest to do so. As stated, I also do not find the Appellant's post-decision application to be timely. For all the foregoing reasons, an order will be entered denying Appellant's application.

*Judges Ransom and Nichols did not participate in the consideration or decision of this application.

J-A04034-18

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT |
| | OF |
| | PENNSYLVANIA |
| Appellee | |
| | |
| v. | |
| | |
| GRAHAM B. SPANIER | |
| | |
| Appellant | No. 1093 MDA 2017 |

Appeal from the Judgment of Sentence imposed June 2, 2017
In the Court of Common Pleas of Dauphin County
Criminal Division at No: CP-22-CR-0003615-2013

**ORDER**

AND NOW, this 10th day of August, 2018, the July 10, 2018, Application

of Appellant, Graham B. Spanier, for recusal of Judge Victor P. Stabile, and

for vacatur of this Court's June 26, 2018 decision and request for reargument

before a new panel or the Court *en banc* is **DENIED**.[1]

_____
Victor P. Stabile, J.

_____

[1] Disposition of this application does not dispose of Appellant's separately filed
application for reargument not based upon his request for recusal.